May it please the court, Craig Gardner here representing the appellant Andrew Zack. The bottom line issue on this case is whether or not the Fourth Amendment allows armed officers to conduct an armed invasion of a home at 1 a.m. based solely upon the information they were provided by a young 16-year-old person that those officers knew had been involved in criminal activity. They knew that he had a reputation and they also knew that he had made an admission of recent drug use to them. The issues of probable cause and exigent circumstances are sort of related on that. All of this information comes from the victim, the alleged victim here. There never was any real corroboration as to whether or not an assault occurred. And we also claim that sort of related to that that the judge made some factual error and that touches upon the facts that I kind of want to focus on. Because what's sort of missing from the record is the things that the officers didn't find out. Well, let's get into this. If we assume that the judge made a finding that when the young man, what was his name? Stevens. Stevens spoke with Officer Whitefoot. Whitefoot was the initial officer that took the initial call. The judge said that Stevens, the incident that happened when Stevens contacted Whitefoot, the incident had just happened. It was immediately, he immediately contacted. The judge found that the judge had, that Stevens had immediately reported the incident. I don't think that's supported by the record. Why not? Both of the officers indicated through their testimony that they had never asked Mr. Stevens when this occurred. It's clear that the officers believed that. But as in all Fourth Amendment jurisprudence, the standard that we use is an objective standard and not the subjective belief of the officers. I believe that's really where the court erred in its analysis and where the government errs in its analysis, arguing that because the officers believed that it had recently occurred that that's somehow relevant to our issue here. I think the most demonstrable factual problem that they have is when the issue of drugs come up later on. Drugs comes up when they go back and contact Mr. Stevens. When the second officer arrives. Well, I mean, there's a couple of things. One is that Officer Whitefoot said that Mr. Stevens was approaching not from where this event supposedly had occurred, but from another residence that he sent Mr. Stevens back to and waited for Officer Rogers to arrive. When Officer Rogers arrived, they re-interviewed Stevens, and at that point he made the admission or the allegation that he had been using drugs with Mr. Zack at the time that the incident occurred, specifically methamphetamine. And at excerpts of Record 65, Officer Whitefoot testifies that he had his firearm out because Mr. Stevens had told him that Mr. Zack had a gun, a loaded weapon, and he was, quote, high on drugs. However, when Officer Whitefoot was questioned about his observations of Mr. Stevens, he indicated that he did not see any signs of intoxication, or I believe the exact words were that he had seen nothing to indicate that Stevens had been using drugs, and he saw Stevens at 12.04. And that sort of raises the factual problems in this case. If there's any inference that Mr. Zack was high on drugs, which is apparently what Officer Whitefoot thought, and that justified entry into the home, then you should have seen Mr. Stevens high on drugs at the time that he was talking to Officer Whitefoot. And Officer Whitefoot said that's clearly not what happened. Wait a minute, counsel. Yes, Ron. Counsel, I'm a little confused about your argument then. I thought you started out by impeaching Mr. Stevens, saying, well, here was this 16-year-old kid who was on drugs, and he's not, in effect, a reliable informant. And now you're saying, well, now he wasn't high enough to corroborate the notion that the other party to the drug use, therefore, wasn't either. That seems you're asking a lot of a reasonable police officer to sort through and parse this. There's no question, is there, in this second interview, that Ethan Stevens said that Zack had a gun and it actually pointed at him, but also said, or shoot Zack. Isn't that when that came out in the second interview? I believe that the initial interview with Officer Whitefoot, the fact that there was a firearm pointed at Mr. Stevens was mentioned. Okay, that was in the first one. And then in the second one he talked about him saying, well, then I want you to shoot me. He said that at some time, he actually said that that occurred at some time prior to the, he said that that occurred in the vehicle, that Mr. Zack put the firearm on his lap and asked Mr. Stevens to shoot him. And then at some later time. I'm just trying to clarify when the officers got that information. That was in the first interview or the second interview? That was the second interview with Officer Rogers and Whitefoot. The point that I'm trying to make, Your Honor, is that the government is trying to have it both ways with these facts. If Ethan Stevens was not exhibiting signs of methamphetamine, and he says that he was consuming methamphetamine at the time that the incident with Mr. Zack occurred, then that is additional evidence that the incident with Mr. Zack was more remote in time from what the officers assumed. And it's also more evidence that Ethan Stevens did not immediately report the incident to law enforcement. Okay. I got your point. So I wasn't, well, given what the officer, just assume that he takes what Zack says, I mean what Steven says, and he's concerned. They didn't ask the questions. They didn't ask, when did this happen? Are you a relative of Mr. Zack? Well, he hears about these weapons and shoot me. Well, at this point, Officer Whitefoot would have actually been in there. Why isn't that, you know, why wouldn't a reasonably prudent officer take action? Well, first of all, because this goes to the very heart of what the Fourth Amendment is there to protect. It's there to protect your home at 1 a.m. It's there to protect your home from armed officers showing up without a warrant at your home at 1 a.m. That's at the very core. The probable cause standard is facts that would allow a reasonably prudent man to conclude that a crime had occurred. The cases that we cite where the officers are supposed to conduct further investigation if the probable cause or the search for probable cause is based upon one witness show that it would be prudent to ask further questions if you're basing your, or to conduct further investigation if you're basing probable cause based upon that one witness. And there were questions that were readily available to Officer Whitefoot and Officer Rogers that they failed to ask. I mean, the time frame just stands out the most. There was some discussion about whether or not Mr. Stevens was a family member with Mr. Zack, which I don't think is supported by the record very well. And then I did want to move on to the consent issue. And I'll just bring it up. I'll just remind you, you have a little over a minute left. Okay. Why don't you cover your other issue? We'll give you an extra minute for rebuttal. Okay. On the consent issue, we have the five factors, and everyone's familiar with those. The problem that I have here is that the way that the court interpreted the five factors or applied the five factors in this case seems to totally eliminate the fact that three armed officers showed up at Ms. Zack's doorway at 1 a.m. from the analysis entirely. The court took the guns were not drawn and said, well, they weren't drawn at the moment consent was given, even though Officer Rogers had his shotgun on the floor next to him when he was talking to Ms. Zack, and ruled that Ms. Zack was not in custody. I think that we made an argument that the situation was like she was in custody. I don't think that at that hour with armed officers in your home that you're going to assume that you are free to go about your business because your business would be going back to bed, and you basically want these officers to not be in your home anymore at that point. And so just going about your business isn't really effective. Did she say, counsel, that they had their gun, the three officers had guns drawn? There was testimony from the officers and Ms. Miller, who was the young lady who initially opened the door, that weapons were displayed at the doorway. I thought they displayed weapons initially, but then Mr. Zack came out and he was arrested. Yes, that's correct. Then they're asking for consent to the search after he's already in custody. So they didn't have, I assume they didn't have their weapons drawn. Then they weren't pointing weapons at the mother. They weren't pointing weapons. But Officer Rogers testified that because he did not have a sling, he had brought a shotgun. He set it down? He set it on the floor. Right, okay. And I think that's the mechanistic application of those factors that is warned against in the case law, that clearly the fact that weapons weren't drawn at that very moment is significant. That doesn't eliminate the significance of the fact that armed officers had showed up at Ms. Zack's door just moments before. You're over the total time. I'm still going to give you another minute, one minute on rebuttal. Even though you went past the ten minutes, we'll give you a minute of rebuttal, if you can compose that well. We permit argument from your colleague from Yakima, Mr. Hamlet. Thank you, Your Honor. May it please the Court, Tom Hamlet appearing on behalf of the United States. I'd first like to address Mr. Gardner's statement, arguing that the district court did not consider Ethan Stevens' drug use. Mr. Gardner filed a motion for reconsideration in this matter, and he specifically raised that issue to the district court regarding Ethan Stevens' drug use. On the excerpt of record, page two, which is the order in regards to the motion for reconsideration, the district court judge specifically addressed that issue, that Ethan Stevens had used drugs. Both parties here agree that in regards to probable cause, we're dealing with the totality of the circumstances. And in that court order, the district court advised that under the totality of the circumstances, which is all the information that was known to the officers, they still had probable cause to make an arrest in this particular case. In regards to the specific facts, Judge Fisher was correct in regards to when did the officers know the information about the pointing of the gun and then the statement regarding that Mr. Zak was suicidal. Initially at 12.04 a.m., Officer Whitefoot, a relatively new officer with only two years of experience, was approached by Ethan Stevens. He failed to ask Ethan Stevens when the incident occurred. Ethan Stevens told him that Mr. Zak had pointed a gun at him and had threatened to kill him. And throughout his testimony on direct and on cross-examination, Officer Whitefoot testified that Ethan Stevens was scared. He feared for his life. He was shaking. He had shakiness in his voice. So based upon the observations of Ethan Stevens' demeanor, Officer Whitefoot believed that this incident had just occurred. So he immediately contacted the senior officer on duty, Officer Rogers. In excerpt of record pages 104 through 106 is a detailed timeline based upon the dispatch logs of when things occurred. Dispatch called out to Officer Rogers to come out to the scene. Officer Rogers, who's on another part of the reservation, and again we're talking about a very large Indian reservation, responded to this particular area, and he arrived at 12.39 a.m. He immediately met with Ethan Stevens at that time with Officer Whitefoot. At that point, Ethan Stevens then provided several more details. He advised not only had the gun been pointed at him, but that he had ingested methamphetamine with Mr. Zak, that Mr. Zak was suicidal and had asked Mr. Stevens to kill him. He advised Mr. Zak that there was a sawed-off shotgun in his house, there was another rifle in his house. Based upon those facts, what the officers knew, in addition to the facts they knew prior to this, that Mr. Zak and Mr. Stevens were family members, and that's on excerpt of record page 60, and Officer Whitefoot knew that Mr. Stevens and Mr. Zak were often seen together in the past at 402, in the front specifically working on vehicles in the past. So based upon all of this, this domestic violence situation among family members, the officers believed that a warrantless arrest was necessary and that exigent circumstances existed. So when they got out, what did they see when they got out to the house? Well, when they first got to the house, they looked at the shed area because Ethan Stevens – Well, did they see any disturbances, any noise, any lights on, anything like that? They did not, just as in this court – Pretty peaceful, right? That is correct, Your Honor, just as in Al-Azwi. It's the same fact in that in regards to when the officers arrived, they didn't observe – How about Gooch? I don't recall Gooch if there was a disturbance, Your Honor, but I'm certain that in this case there wasn't. Gooch, they were at the camp, right? Is that what the – That was the camp. Yes, Your Honor. I don't recall that. I think there was – He shot somebody. In that case, he'd actually shot somebody. Yes, Your Honor, and I believe that – You said that there were not exigent circumstances in Gooch. That's correct, Your Honor, and both parties in this case have cited to Al-Azwi, which I think the facts of that – In Al-Azwi, there was explosives. That was – and the statement in regards to explosives was provided by the neighbor, Williams, and he stated that another person, a third party, had told him about the explosives. And this court determined – Judge Beezer was the author of both Al-Azwi and Gooch, and Judge Beezer explained that the difference, the critical difference, was that there was information about explosives in Al-Azwi. And I think a critical difference between both those cases and this case, looking at Peng, is that this case involved family members, and this court has recognized in the – What, did he threaten to shoot his mother? He did not threaten to shoot his mother. He threatened to shoot his cousin, and both of these two individuals who were related were known to be at this residence, often by Officer Williams. The cousin was out of the house, though, right? Mr. Stephens? Yes. Yes, Mr. Stephens was out of the house.  Was he in any danger at that time? Mr. Stephens was not in danger at that time. Let me ask you, any time there's allegations about guns, the presence of guns, does that give the officers a reasonable basis for exigent circumstances to enter a house? I don't think just the allegation that a gun is involved in – Why not? Well, certainly guns are illegal. You can possess a gun. Well, you know, what if there's evidence that he's swirling a gun around, moving a gun around? I think it would go back to the totality of the circumstances. What would a reasonable person believe had occurred, or would a reasonable person believe that this person, in fact, commit a criminal offense? And in this particular case, not only was there statements about guns, there was also the statement in regards to the methamphetamine use. There was also – Let me ask you this. Tell me about methamphetamine. What's in the record that educates us about methamphetamine? There is nothing in the record that educates us about methamphetamine. What's the effect of methamphetamine on someone? In the record, there was no scientific testimony in regards to what effects methamphetamine – Does that make somebody – explain to me. Do you know? Well, I would think that if someone is – if your mental state is altered, if you're high on methamphetamine – How about if you're high on marijuana? If you're high on marijuana or if you're overly intoxicated, you know, obviously a legal substance, certainly that causes concern when you connect – Why? Tell me why. When you connect alcohol and the possession of a firearm, I think someone who's not of a proper state of mind due to the fact that they're intoxicated on a controlled substance certainly has a bearing on what an officer's decision is going to make in regards to danger to a potential household. Intoxication plus firearm equals danger. I would agree that alcohol – I mean, every gun safety class you'll ever attend will tell you do not fire alcohol – pardon me, do not fire a firearm if you're using alcohol. Those two things are not mixed, just as drugs and firearms are not mixed. And this Court has repeatedly referenced in the past that when you have someone – although it's in the context of dealing drugs, but when someone is dealing drugs and they are armed with a firearm, that presents a certain risk. And Congress has certainly recognized that fact by passing 924C. What if this all had occurred about an hour – about two hours before the officers arrived at the house? Would that make a difference? I think it does make a difference in regards to exigency, but here the officers, based upon the demeanor of Mr. Stevens and the fact that Mr. Stevens had a weapon in his pocket and he advised that he had the weapon in his pocket because he feared for his life, I think the officers could have reasonably concluded that this was something that had recently happened and that they needed to act in order to protect other members of the household. And specifically, Officer Rodgers testified he felt that he needed to protect the suicidal subject, Mr. Jack himself. In regards to the consent issue, Mr. Gardner advised that the District Court had made a number of errors. Specifically, he advised the District Court made an error when he said that Mr. Wionazak, and I'll call her Wiona for the purposes of today, was not contradicted by two law enforcement officers, which was found by the District Court that that, in fact, happened. And I just wanted to point out, looking at the record, their stories were remarkably different. Officer Whitefoot testified that he had approached the door, that he had spoken with Angel Miller, who answered. Then he had a conversation with Wionazak at the door. The defendant then came outside, and at that point, the defendant was placed under arrest when he stepped outside. Officer Rodgers testified that Officer Whitefoot was at the door. There was a conversation, and again, the defendant was arrested and taken outside. Mrs. Jack's testimony was that that's not how it occurred. She testified that Officer Whitefoot was not at the door. She testified that Officer Rodgers came to the door. She immediately then wanted to know what her rights were. Officer Rodgers then presumably lied to her and told her that she was required to allow him into the house, and then he then entered the house and asked where the bedroom was. Officer Whitefoot testified he saw Officer Rodgers on one knee talking to Wiona. He then stood up and advised she had provided consent. Officer Rodgers testified that he had gotten down on one knee. He had asked for consent. She provided consent. Wiona testified that this entire conversation took place at the door when Officer Rodgers came in and instructed her that she had to require him to enter the house. So I do believe that the statements of Wiona, those statements of that testimony, was contradicted by the two sworn police officers. So it came down to credibility. It did come down to credibility, Your Honor. This entire case came down to credibility, and the district court had the advantage of hearing these witnesses in this courtroom, observing their demeanor, and making a determination. And that's all I have unless the court has additional questions for me. I have no questions. Judge Fischer? Thank you, Your Honor. I'm fine, thank you. Mr. Gardner gets some rebuttal time. Officer Whitefoot testified regarding the consent issue that he specifically did not hear any of the conversation between Wiona and Rodgers. He said that he would not be able to testify concerning the consent, and that's the factual error that we claim. So if you take Judge Gould's sort of response, or not response, but statement that drugs and alcohol and guns. I would point out that in Gooch that there was alcohol involved. Equals danger, right? That in Gooch there was alcohol involved. There were claims that Gooch had been under the influence at the time that, you know, obviously the violence involved there was greater. The incident of substance abuse there was also there, and the court found no exigent circumstances. I think the primary difference between Olozawi and this case is the extent of the danger presented with the explosives, but also there's not a lot of discussion about the person who made the report, Williams. He's described only as a neighbor. There's a big difference between an adult neighbor, a guy that's been living in the house for X number of years. You know, I'm assuming that the reason there's not a lot of battle is because there's nothing for the defense to attack regarding his credibility, because he was just average Joe neighbor guy. There's a big difference between that person and the person we have as a reporting party here who is known to be a troublemaker, get into trouble with law enforcement, and possibly under the influence of alcohol. Gardner, I'm sorry, but you're over even the extended time, so unless Judge Peyser and Judge Fischer have questions, we have no time. No, thank you. I appreciate the argument. It was a very fine argument. We thank Mr. Gardner and Mr. Hanlon. Thank you. Have a safe drive back through the pass. That's how you travel here.
judges: Fisher, Gould, Paez